MARTIN, J.
The plaintiff is the owner in fee and in possession of certain premises described in the complaint. It has been such owner *322 and held such possession since about March 2, 1860. These premises are situated on the west side of Marsh street, and extend to the center line thereof, subject to the right of the public to use the same as a street or highway. Marsh street was, prior to March, 1860, and ever since has been, a public highway, and one of the public streets of the city of Syracuse. On November 22, 1855, the Syracuse Coarse Salt Company leased from the state of New York the other land described in the complaint. This lease was assigned to the plaintiff March 2, 1860. The plaintiff thereupon entered into possession of such land, and has ever since remained in possession thereof under its lease, which has not expired. The easterly line of these premises is also the center line of Marsh street. The premises owned by the plaintiff in fee extend along the center of Marsh street for a distance of about 800' feet, and the premises leased by it for a distance of about 264 feet. Since 1860 the plaintiff has used the lands owned and leased by it for the manufacture of coarse salt by solar evaporation, and has erected thereon vats for that purpose. It has also erected upon the lands owned by it six small dwellings fronting on Marsh street, which are occupied by its tenants. In 1871 and 1872 the Syracuse Northern Railroad Company laid the tracks of its railroad through a portion of Marsh street and past the premises owned and leased by the plaintiff, and commenced and continued to operate its railroad over and upon su<?h tracks. In 1872, 1873, and 1874 it, with the consent of the city of Syracuse, extended its tracks from Marsh street, through Franklin street, to the tracks of the New York Central Railroad Company, and from Marsh street through various other streets in the city to the tracks of the Chenango Valley Railroad Company. The defendant and its predecessors have operated this railroad through Marsh street since 1871- and 1872. In front of the premises owned by the plaintiff the tracks of the railroad were to some extent laid upon the west half of Marsh street and upon the lands of the plaintiff. Upon the same side of the street the company also placed side tracks and switches, but the main track, for substantially the whole distance, is beyond the center line of the street, and upon lands to which the plaintiff has no title: The city of Syracuse consented to the use which was made of Marsh street for railroad purposes, including the laying of a switch therein, to the extension of the tracks from Marsh street, through Franklin street, to the tracks of the New York Central & Hudson River Railroad Company, and to the connection made between the tracks in Marsh street and the tracks lead: ing to the Chenango Valley Railroad. In 1873 the Syracuse Northern Railroad Company purchased of the plaintiff for $585 a piece of land containing about one third of an acre, which adjoined the premises now owned by the plaintiff, and extended to the center of Marsh street. This land was purchased to enable the railroad company to extend its tracks from Marsh street, through Franklin street, to the tracks of the New York Central & Hudson River Railroad Company. After its purchase, the company, in making such extension, laid its tracks across the land so purchased, which would have been practically useless to ■the. company unless it could also use its tracks in Marsh street. This *323 fact was known to the plaintiff when it sold the land. The tracks and switches operated by the defendant in Marsh street were, however, laid and have been maintained without the express consent of the plaintiff, without acquiring any title to that portion of Marsh street owned and leased by it, without paying or offering to pay any compensation therefor, and without instituting any proceeding to condemn or acquire plaintiff’s interest therein.
In July, 1874, an action was commenced against the Syracuse Northern Railroad Company to foreclose a mortgage given by it, which covered all the property, tracks, rights, and franchises it had in Marsh street. Certain towns in Oswego county and the city of Syracuse were made parties to that action, which was defended. Judgment of foreclosure was entered therein, and the property, rights, and franchises of said railroad company were sold thereunder in August, 1875. The company was subsequently reorganized under the name of the Syracuse & Northern Railroad Company, and consolidated with the defendant December 15, 1875, when the defendant became the purchaser and owner of the property sold under such foreclosure. The tracks and switches in Marsh street have been used by the defendant and its predecessors from the time they were laid until the rime of the commencement of this action. The officers of the plaintiff knew of the pendency of the foreclosure action; that defenses had been interposed; that judgment of foreclosure was rendered; that the property described in said judgment was to be sold; the time and place of such sale; and that the property was sold to the defendant’s predecessor in title. No claim was made or notice given by the plaintiff of any adverse interest in the right of way in Marsh street used and occupied by the Syracuse Northern Railroad Company and its successors, until just prior to the commencement of this action, nor was any claim made or notice given to the defendant or its predecessors of any right, title, or interest in or to the property involved in this action until about that time. The defendant was a purchaser for value of the property acquired under such foreclosure, including all the rights and property of the Syracuse & Northern Railroad Company and its predecessor in and to Marsh street and the property owned by it therein. The defendant’s grantor had no knowledge that the plaintiff claimed any right, property, or interest in the street, and was a purchaser of the property in good faith. Before the foreclosure sale a large amount of bonds had been issued by the Syracuse Northern Railroad Company, secured by the mortgage foreclosed. Since such sale a large amount of bonds has been issued by the defendant, secured by mortgages on the property and franchises purchased at such sale, which bonds are now in the hands of third parties, who purchased them for value prior to the commencement of this action, without knowledge of any defect in the title of defendant or its grantor in or to the premises and property covered by said mortgages. The issuing of said bonds and making of said mortgages were matters of public notoriety. The present stockholders of defendant’s road have to a large extent become such since the consolidation, and before the commencement of this action. They and the holders of the de *324 fendant’s bonds paid full value for such stock and bonds, without knowledge of any defect in the title of defendant or its grantors, or of any claim of the plaintiff to the property involved in this action, and were purchasers in good faith of such stock and bon'ds.
James J. Belden became a director of the Syracuse Nbrthern Railroad Company June 11, 1872, and its president June 15, 1872. He continued qs such president and director until October 22,1875. The firm of Dennison, Belden & Co., of which he was a member, became stockholders of that road to the amount of $37,000 on June 4, 1872, and continued to be stockholders up to the time of the foreclosure sale. On March 8, 1877, James J. Belden became the owner of $44,900 of the capital stock of the plaintiff, which he still owns. He was a director of the plaintiff from 1877 to 1890, and was its president from 1877 to 1887. A. Caldwell Belden was also a member of the firm of Dennison,' Belden & Co. He has been a large stockholder of the plaintiff from March 8, 1877, to the present time. He was a director from 1877 to 1890, and its president from 1887 to 1890. Since 1872 a steam railroad has'been maintained and operated by the Syracuse Northern Railroad Company, its grantees, and the defendant, in Marsh street, partly upon that portion which is owned in fee by the plaintiff. From the time the tracks were laid in Marsh street up to the commencement of this action, the Syracuse Northern Railroad Company and its successors have operated the railroad therein without opposition from the city of Syracuse, and it has in various ways recognized the rights of the defendant and its predecessors to operate the railroad in that street, and has consented to such use of the street by the defendant and its predecessors. The plaintiff made no objection to such usé of Marsh street by the defendant and its predecessors for the period of about 17 years, and until just previous to the commencement of this action in 1888. The railroad and switches in that street are lasting, intended for continuous and permanent use, and the defendant threatens and intends to continue to maintain, use, and operate said railroad and switches. The defendant’s main track is laid for substantially the whole distance in front of plaintiff’s premises on Marsh street upon the surface of the street. This action was commenced December 7, 1888. For 17 years prior to this action the plaintiff permitted the defendant and . its predecessors to occupy and use Marsh street for railroad purposes in the manner it is now used, without objection on the part of the plaintiff, or any attempt to-restrain such use, and defendant, its predecessors and grantor, spent large sums of money in the construction and maintenance of the railroad therein.
The trial court found as inferences to be drawn from the facts stated that the plaintiff in 1873, for a valuable consideration, gave a license to the Syracuse Northern Railroad Company to use Marsh street for its tracks; that that company, its grantees and successors, acted under such license, and made large extensions to their tracks, at great expense, upon the faith thereof, and relying thereon, to the knowledge of the plaintiff; that the defendant and its predecessors from the acts and conduct of the plaintiff had reason to and did understand and believe, to *325 the knowledge of the plaintiff, that it consented to and acquiesced in the use made by the defendant and its predecessors of Marsh street for railroad purposes, and that, in consequence thereof, large sums of money were expended by the defendant in the construction of its railroad in Marsh street, to the plaintiff’s knowledge. As conclusions of law the court held that the plaintiff gave the defendant’s predecessor a license to maintain its road in Marsh street, which was acted on by the defendant and its predecessors, and that plaintiff was estopped from denying such license or revoking it; that its acquiescence in the use of Marsh street for 17 years rendered the plaintiff guilty of such loches as deprived it of the right to maintain this action; and that defendant was entitled to judgment dismissing the complaint,, with costs.
The broad questions presented upon this appeal are: First, whether the court was justified by the evidence in finding that the plaintiff gave the defendant or its predecessors any such license to enter upon its premises in this street, and lay and maintain its tracks, as was found by the trial court, or as would estop it from claiming its legal rights to the land in question; and, second, whether by its acquiescence in the use of such land for railroad purposes it was guilty of such loches as would deprive it of any right to the equitable relief sought in this action. The purpose of the action was to restrain the defendant from operating its road upon that portion of Marsh street which was upon the plaintiff’s premises, until it should acquire the right to the use of the same, and for damages previously sustained by reason of the defendant’s use and occupation thereof. It seems to be well settled in this state that the dedication of land to the use of the public as a street or highway does not preclude the owner in fee, subject to the public easement, from maintaining an action against a railroad, which, without his consent or an appraisal of his damages, enters upon and occupies such highway with the track of its road. Such an appropriation of the highway by the railroad company is the imposition of an additional burden upon, and a taking of the property of, the owner of the fee, within the meaning of the constitutional provision which forbids such taking without compensation. Williams v. Railroad Co., 16 N. Y. 97; Mahon v. Railroad Co., 24 N. Y. 658; Wager v. Railroad Co., 25 N. Y. 526; Craig v. Railroad Co., 39 N. Y. 404; Henderson v. Railroad Co., 78 N. Y. 423. Where a railroad 'is unlawfully constructed in a street, the adjacent owner, whose title extends to the center, it would seem, has three remedies: (1) He may bring successive suits to recover his damages; (2) he may bring an action in equity to restrain the operation of the road; or, (3) when the highway has been exclusively appropriated, he may maintain ejectment. Uline v. Railroad Co., 101 N. Y. 98, 4 N. E. Rep. 536. That in cases like this a suit in equity may be maintained to restrain the defendant from unlawfully using the plaintiff’s land, and for damages sustained by such use, is well established by the authorities in this state. Henderson v. Railroad Co., 78 N. Y. 423; Murdock v. Railroad Co., 73 N. Y. 579; Shepard v. Railroad Co., 117 N. Y. 442, 23 N. E. Rep. 30; Galway v. Railroad Co., 128 N. Y. 132, 28 N. E. Rep. 479; Lynch v. Railroad Co., 129 N. Y. 274, 29 N. E. Rep. 315. It follows, therefore, *326 that the plaintiff was entitled to the relief sought, and the court erred in dismissing the complaint, unless the plaintiff was estopped from enforcing its right against the defendant, or its acquiescence in the taking and occupation of the land by the defendant and its predecessors, and its loches in not before asserting its rights, have deprived the plaintiff of the right to maintain this suit. This leads to the consideration of those questions.
Did the plaintiff perform or omit to perform any act which estopped it from asserting its right as against the defendant or those whose interest it represents ? That the owner of real property may, by a course of conduct which induces other persons to deal with it without informing them of his claim, debar himself from asserting his title to their injury, is a well-established principle of the law of estoppel. In Wendell v. Van Rensselaer, 1 Johns. Ch. 344, Chancellor Kent said:
“There is no principle better established in this court, nor one founded on more solid considerations of equity and public utility, than that which declares that if one man knowingly, though he does it passively, by looking on, suffers another to purchase and expend money on land under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is bound by this equitable estoppel. ”
In the late case of Trustees v. Smith, 118 N. Y. 641, 23 N. E. Rep. 1002, it is said:
“The general rule deduced from all the authorities is that if one is induced to purchase land by the acts or representations of another, designed to influence his conduct, and creating a reasonable belief on his part, under which he acts, that he is thereby acquiring a valid title to the same, the party who thus has influenced him is estopped from setting up his own title, existing at the time of the purchase, against that of the purchaser.”
“To authorize the finding of an estoppel in pais against the legal owner of land there must be shown, we think, either actual fraud, or fault or negligence equivalent to fraud, on his part, in concealing his title; or that he was silent when the circumstances would impel an honest man to speak; or such actual intervention on his part as to render it just that, as between him and the party acting upon his suggestion, he should bear the loss.” Andrews, J., in Banking Co. v. Duncan, 86 N. Y. 230. " '
“The vital principle [of the doctrine of estoppel in pais] is that he who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. * * * No estoppel can be created by mere silence or acquiescence, unless there are some special circumstances which make it necessary to speak. * * * The true rule seems to be—and with it goes the later and better-considered cases—that the mere presence of the owner, if he have concealed no fact of which he was informed, and which the purchaser could not have learned by the use of reasonable diligence, will not create an estoppel unless the purchaser can show that he had reason to suppose, from the presence of the owner, that he sanctioned and acquiesced in the sale. * * * One essential element of every equitable estoppel by which a man is to be precluded from claiming what is his own is ignorance on the part of the purchaser or party claiming the benefit of the estoppel as to the true state of the title. To estop a vendor of real estate by statements imregard to the effect of his deed or extent of the grant, such ignorance on the part of the purchaser must concur with knowledge of his title and willful concealment or misrepresentation in regard to it on the part of the vendor, or such gross negligence or indifference to the rights of others, as, under the circumstances, to be equivalent to actual and premeditated fraud. It must also appear that the language or conduct of such vendor was the direct inducement to the purchase by the other party, and that the purchaser will suffer if the vendor is permitted to deny it. ” Herm. Estop. §§ 934,937, 947, 949.
*327 In the present case we find no sufficient evidence to justify the finding that the plaintiff gave the defendant or its predecessor any express license to enter upon or construct its road over the lands in question. Nor do we think any such license is to be presumed or implied. It must be assumed, therefore, that the defendant’s predecessor entered upon the premises in question without authority, and was a trespasser in so doing. While it was thus in possession, it gave a mortgage upon all the property and franchises owned by it. That the mortgage in fact covered the land in question is not pretended, unless it was included therein by reason of the maps made by that company, and filed June 12,1871, and August 5, 1872. All that appeared from those maps was that the line of the railroad in question was laid through Marsh street. We can find in them no evidence that the company had acquired, or even believed it had acquired, the title to the plaintiff’s land over which the tracks were laid, or from which the purchaser at the mortgage sale was justified in believing that the title was in the company, while the record disclosed that it was in the plaintiff. The record was constructive notice to the purchaser of plaintiff’s title, especially as the mortgage referred to the maps, deeds, and orders to show what title the railroad company had. Burely no title could be claimed from the mere fact that it appeared upon a map that the railroad was laid on the plaintiff’s land, with no evidence or claim that it had been otherwise acquired. It is therefore difficult to see how the purchaser under that mortgage could have supposed or believed that he acquired any title other than that which had been actually conveyed to or acquired by the railroad company that executed the mortgage. It is, however, claimed by the respondent that, although the railroad company was a trespasser, and the purchaser under the foreclosure sale acquired no legal title by such purchase, still the plaintiff is estopped from asserting its legal title against the defendant, because the plaintiff’s officers knew of the foreclosure proceedings at the time, knew that the judgment embraced all the property owned by the railroad company, knew the time and place of the sale, and that all the property of the railroad company was sold under such judgment; but made no claim, and gave no notice of plaintiff’s title to the land, until about the time of the commencement of this action. Also, because the defendant was a purchaser for value, and had sold its bonds and stock to bona fide holders, who had no knowledge of any defect in the defendant’s title to these premises. There was, however, no proof that any of the plaintiff’s officers attended the foreclosure sale, or that they knew or understood that either the railroad company or the purchaser was led to believe or believed that the property sold included the right of wray over the plaintiff’s land. Neither was there any proof that any representation whatever as to such right was made, or that the company sold or offered for sale any property or interest save that which was owned by it, or to which it had acquired title by deed, purchase, or condemnation. Nor was there any evidence tending to show that the purchaser was in any way deceived or mistaken, or that he did not acquire all .the title he supposed he would under such sale, or was not fully apprised of the facts as to plaintiff’s title, or that he relied upon *328 any statement made, or upon the omission of the plaintiff to assert its title, in making such purchase. "Under these circumstances, we think it cannot properly be held that the plaintiff was estopped by the transactions attending the mortgage, its foreclosure, and the sale under it, from assei'ting its title to the land in question against the defendant or any persons that it represents as holders of its bonds or stock.
In Rubber Co. v. Rothery, 107 N. Y. 310, 14 N. E. Rep. 269, a riparian owner saw the owner on the opposite side of the stream erecting a factory and digging a race, which she knew would return the water diverted from the stream to a point below her land, and it was held that her omission to object in any way to the proposed diversion of the water did not constitute an estoppel barring an action to recover for such diversion, and the court said:'
“To constitute it, the person sought to be estopped must do some act or make some admission with an intention of influencing the conduct of another, or that he had reason to believe would influence his conduct, and which act or omission is inconsistent with the claim he proposes now to make. The other party, too, must have acted upon the strength of such admission or conduct. In cases of silence there must be not only the right, but the duty, to speak, before a failure so to do can estop the owner. ”
The same doctrine was considered in the case of Viele v. Judson, 82 N. Y. 32, where it was held that to sustain an estoppel because of omission to speak there must be both the specific opportunity and the apparent duty to speak. The party maintaining silence must have known that some one was relying thereon, and was either acting or about to act as he would not have done if the truth had been told. A similar question arose in the case of Leonard v. Spencer, 108 N. Y. 338, 15 N. E. Rep. 397. In that case it was held that the fact that a dam had been maintained a great number of years, and that, with the knowledge of the plaintiff, and without objection on his part, the defendants had erected a large factory, in place of a former one destroyed by fire, to be and which was operated by the water drawn from the pond, was not such an acquiescence on his part as precluded him from maintaining the action, at least in the absence of evidence that defendants took solfie action in reliance upon the silence or acquiescence of the plaintiff. So in the case of Chapman v. City of Rochester, 110 N. Y. 273, 18 N. E. Rep. 88, where the defendant constructed a series of sewers which discharged into a creek above the plaintiff’s land, without objection from the plaintiff while the work was progressing, in an action to enjoin the city from polluting the stream, it was held that, in the absence of proof that the plaintiff encouraged the adoption by the defendant of its system of sewerage, or by any act or word induced it to so direct .the sewers that the flow from them should reach his premises, plaintiff was not estopped by acquiescence. In discussing the doctrine of estoppel in Thompson v. Simpson, 128 N. Y. 291, 28 N. E. Rep. 627, Andrews, J., says:
“The owner of property which another has assumed to convey without authority is not precluded by mere silence from subsequently claiming it. There must, in addition, have been both an occasion and a duty to speak, and it must appear that the omission to speak, upon opportunity being presented, was intentional, or in" negligent disregard of the plain dictates of conscience and jus *329 tice. * * * The mere fact that another may act to his prejudice if the true state of things is not disclosed does not render silence culpable, and mere inaction in such a case is not sufficient. The true owner owes no duty of active diligence to protect the other party from injury. There must be a standing by and encouragement, or at least an acquiescence, on the part of the true owner in acts inconsistent with his right, knowing that the other party, acting under a false impression, is about to do what will result in his injury. * * * The security of legal titles to real property, and-the uniform policy of the law, require that the doctrine of equitable estoppel, when invoked to bar the assertion of a legal title to land, should be cautiously applied, and only when the grounds for its application are clearly and satisfactorily established. ”
Nor do we think the plaintiff was estopped from asserting its title to the land owned by it in Marsh street by reason of its sale to the defendant’s predecessor of an adjacent piece to enable it to extend its tracks to other portions of the city. The only fact shown in relation to the transaction, except the transfer of the land by plaintiff, and the use made of it by the purchaser, is that the plaintiff knew when the purchase was made that the purchaser intended to build a railroad across it. This was conceded. These facts are not, we think, sufficient to estop the plaintiff from asserting its title to its lands in Marsh street. If it be admitted that the land was purchased for the purpose of the extension of the railroad through Franklin street to the tracks of the New York Central & Hudson River Railroad Company, and that the extension would be useless unless the tracks in Marsh street could be used, yet we do not perceive how those facts would estop the plaintiff from claiming its title to its land in Marsh street. Surely the corporation making that purchase knew as well as the plaintiff that it had acquired no right to the land in question by condemnation or otherwise. No representations were shown to have been made, and the plaintiff’s silence could not have in any way misled the purchaser. It could have condemned the plaintiff’s land then as it can now. We are unable to discover any principle upon which it can be held that the purchase of this adjacent property in any way estopped the plaintiff from asserting its right to the property in question, nor do we find anything in the authorities cited that would, sustain that claim. Hence we conclude that the plaintiff neither did nor omitted any act which estopped it from asserting its right to the property in question as against the defendant or those whom it represents.
The respondent seeks to uphold the judgment in this case upon the principle that where a party for a valuable consideration grants to another a license to make partial use of his land, under circumstances amounting to an implied contract for an easement, and such license is ■executed, and large sums expended by the licensee upon the faith and credit thereof, to the knowledge of the licensor, and such use continued without opposition for a long period of time on his part, the latter is estopped from asserting his rights by a suit in equity; and cites as sustaining this doctrine the case of Wiseman v. Lucksinger, 84 N. Y. 31; Cronkhite v. Cronkhite, 94 N. Y. 323; and various authorities in foreign jurisdictions. The cases in this state do not, we think, uphold the decision and judgment of the court below. An examination of those cases discloses that no such license or estoppel will be held to exist except *330 under circumstances which would make the assertion of a legal title operate as a fraud upon the persons claiming under such license or estoppel. The question presented by this contention of the respondent is controlled by the doctrine of equitable estoppel, and, as we have already examined that doctrine, so far as it is applicable to the facts in this case, any further consideration of it seems unnecessary.
This brings us to the consideration of the question whether the plaintiff has lost its right to maintain this action by its acquiescence in the úse of the land in question by the defendant and its predecessors, and its loches in not sooner asserting its rights. The opinion of the trial judge renders it manifest that the ground upon which it was held that the plaintiff could not maintain this action was that the relief asked for v\tis purely equitable, and not in aid of or to enforce a legal right. It must be regarded as settled in this state that the doctrine of acquiescence or loches as a defense to an equity action is' limited to actions of an equitable naturd exclusively, or to those where the legal right has expired, or the party has lost his right of property by prescription or adverse possession; and that, where a legal right is involved, and upon grounds of equity jurisdiction the courts have been called upon to sustain the legal right, the mere loches of a party, unaccompanied by circumstances amounting to an estoppel, constitute no defense. Galway v. Railroad Co., 128 N. Y. 132, 28 N. E. Rep. 479. The same doctrine is also recognized in Calhoun v. Millard, 121 N. Y. 69, 24 N. E. Rep. 27; Fullwood v. Fullwood, 9 Ch. Div. 176; In re Baker, 20 Ch. Div. 230. We cannot agree with the learned trial judge in his conclusion that this suit was exclusively equitable in its nature. The action was to enforce the existing legal rights of the plaintiff, which had neither expired nor been lost by prescription or adverse possession. The relief sought by “the injunction of the court and its alternative damages are to be deemed a substitute for the ordinary proceedings for condemnation, with the practical difference only that in one case the company is the moving party and the other the owner.” Finch, J., in American Bank Note Co. v. New York El. R. Co., 129 N. Y. 270, 29 N. E. Rep. 302. We think the plaintiff’s legal rights were clearly involved in this action, and that the mere acquiescence or loches of the plaintiff, not amounting to an estoppel, constitutes no defense. These considerations lead to the conclusion that the trial court erred in dismissing the plaintiff’s complaint, and that the judgment appealed from should be reversed.
Judgmént reversed on the law and facts, and a new trial ordered, with costs to abide the event. All concur.